UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————X

BASIL R. BROWNE,

                    Plaintiff,

          -against-

CITY UNIVERSITY OF NEW YORK,
SAMUEL HEILMAN, CHARLES SMITH,
DEAN SAVAGE, CARMENZA GALLO,
PATRICIA CLOUGH, PYONG GAP MIN,
ANDREW BEVERIDGE, JANE DENKENSOHN,

                    Defendants.

——————————————————————X

**OPINION & ORDER**
**CV-00-5697 (SJF)(VVP)**

FEUERSTEIN, J.

          Basil R. Browne (plaintiff) commenced this employment discrimination action against

defendant City University of New York (CUNY) and defendants Samuel Heilman, Charles

Smith, Dean Savage, Carmenza Gallo, Patricia Clough, Pyong Gap Min, Andrew Beveridge, and

Jane Denkensohn (collectively, the individual defendants) alleging claims, *inter alia*, under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*   CUNY now moves pursuant to

Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint.

For the reasons stated herein, CUNY's motion is granted and the complaint is dismissed.


I.      BACKGROUND

          A.      Factual Background[1]

---

[1] The facts are derived from CUNY's statement of material facts pursuant to Local Rule
56.1 and the accompanying affidavits and other evidentiary material filed in support of CUNY's
motion for summary judgment, as well as plaintiff's response to CUNY's statement and

1.    The Parties

Plaintiff is a black male of West Indian descent who was born in Jamaica. In September 1989, plaintiff was appointed as an assistant professor in the Sociology Department at Queens College (the Sociology Department or the Department), a senior college within the CUNY system. Plaintiff was reappointed each successive year until he was granted tenure, effective September 1, 1995.

CUNY is a state agency created by statute to be "an independent system of higher education governed by its own board of trustees responsible for the governance, maintenance and development of both senior and community college units of the city university." N.Y. Education Law § 6201.

Defendant Samuel Heilman (Heilman) was, at all relevant times, a professor of sociology at Queens College and was the chair of the Department from 1996 to 1997.

Defendant Charles Smith (Smith) is presently employed at Queens College (the College) as a professor of sociology and was the chairperson of the Department from 1988 to 1991 and from 1997 to 2000; the acting dean of the Division of Social Sciences from 1991 to 1992; the dean of the Division of Social Sciences from 1992 to 1996; and a special assistant to the president of the College from 1996 to 1997.

Defendant Dean Savage (Savage) has been employed as a faculty member at Queens College since 1971 and is presently a professor of sociology and chairperson of the Department. In addition, at all relevant times, he was a member of the Department's technology committee.

---

counterstatement of disputed material facts and the accompanying declarations and evidentiary material filed in response to the motion. The facts are undisputed unless otherwise indicated.

Defendant Carmenza Gallo (Gallo) is a Hispanic female employed by CUNY as a professor of sociology at Queens College.

Defendant Patricia Clough (Clough) is an Italian-American female employed by CUNY as a professor of sociology at Queens College.

Defendant Pyong Gap Min (Min) is of Asian/Pacific Islander descent and is employed by CUNY as a professor of sociology at Queens College.

Defendant Andrew Beveridge (Beveridge) is employed by CUNY as a professor of sociology at Queens College and was the chairperson of the technology committee of the Department in 1994.

Defendant Jane Denkensohn has been special counsel to the president and labor designee at Queens College since 1991.

During the 1998 academic year, Smith, Savage, Clough, Gallo and Min were members of the Personnel and Budget (P&B) Committee of the Department. The P&B Committee is responsible for evaluating and recommending academic candidates for promotion.


2. Savage's Letter of Recommendation

During the 1991-1992 academic year, Velina Jules (Jules), a student majoring in sociology, applied for a position in the Minority Opportunity Summer Training (MOST) program offered by the American Sociological Association[2]. At Jules's request, Savage, who was her faculty mentor at that time, wrote a letter of recommendation to the MOST program. The letter

---

[2] The MOST program, which was limited to minority students, offered qualified undergraduate students the opportunity to pursue scholastic and research opportunities during the summer at certain universities throughout the United States.

of recommendation, dated December 23, 1991, indicated, in pertinent part, as follows:

> "I am writing to urge to you [sic] accept Velina Jules into the MOST program. I have known Velina for a little less than a year, but had heard other faculty members speak of her before then as a very promising black student. * * * [She] was one of six new fellows accepted in [a Mellon minority fellowship at Queens College] a a [sic] highly competitive college-wide competition. * * *
>
> The first thing to say is that she is extremely competent; she is a solidly capable student, as her academic GPA demonstrates. She is not flashy, and I would not say that she is an intellectual (at least not at this point), but she is highly motivated and she is willing to do whatever it takes to achieve her career goals. She works hard, is willing to do extra work, seeks out additional advice and comment, and then uses what you tell her in revising her work. * * *
>
> * * *
>
> While she is able and can do the work, she isn't quite sure yet what academic life is all about. * * * Ms. Jules has no personal constraints that I am aware of, but she is a little reluctant to think about living and working outside the New York City area, and she is a little apprehensive about the competition. A summer session at MOST would be an exceptionally effective and useful experience for her. And it would allow Prof. Browne and myself to be maximally effective in preparing her for graduate work in sociology during her senior year here at the College. Accordingly, I urge you to accept her into the MOST program – she is exactly the sort of student for whom the program is intended, and both she and the discipline will benefit from her attendance.

According to plaintiff, Jules found the reference to her race in the letter to be inappropriate and found portions of the letter to be condescending, inappropriate, derogatory, and presumptuous.

Jules was accepted into the MOST program for the summer session of 1992 at the University of California at Berkley. On July 28, 1992, Jules sent Savage an e-mail, *inter alia*, thanking him for encouraging her and helping her to receive the fellowship for the MOST program. According to plaintiff, at the time that Jules had sent the e-mail, she had not yet seen

4

Savage's letter of recommendation.

In the fall of 1992, Jules and plaintiff, who had replaced Savage as Jules's mentor, discussed the letter of recommendation. At his deposition, plaintiff testified that he found the comment in the letter about Jules's race to be inappropriate, but that he told Jules that Savage's intentions in writing the letter were "good." After the conversation, plaintiff brought Jules's concerns to the attention of Smith. According to plaintiff, Smith did not take any steps to address the situation.

### 3. Savage's Comment at a Faculty Meeting

Plaintiff alleges that during a faculty meeting in the early 1990s, Savage made a comment that "black students want things easy or [to] be treated differently, and complain about grades."

### 4. April 1998 Faculty Meeting

At a faculty meeting in April 1998 during which the issue of security was addressed, plaintiff indicated that he had observed an older gentleman walking aimlessly in the hallway of the Department on several occasions. Heilman added that he, too, had seen the "oriental gentleman." Thereafter, either Smith or Beveridge informed Heilman that the correct term was "Asian" not "oriental." The parties dispute whether Heilman apologized for making the comment.

In a letter to Smith dated April 28, 1998, plaintiff indicated that he was "not accusing anyone of racism, or sexism; [but he felt that Heilman's] slip was unfortunate and insensitive." Plaintiff requested "that the issue of sensitivity training be discussed by the Sociology

Department." None of the three Department faculty members of Asian descent who were present at the faculty meeting complained to the chairperson about Heilman's comment or the Department's handling of the matter.

At his deposition, plaintiff admitted that he had never been subjected to racial slurs by anyone at Queens Colleges and that Smith never made any derogatory comments about his race. Plaintiff alleges, however, that he took issue with Heilman's comment because "he is partly of Asian descent" (Plaintiff's Local Rule 56.1 Statement [Plf. Stat.], ¶ 14), insofar as his sister's husband is Chinese and his nieces are of Asian descent.

### 5. Denial of Promotion

In the Spring 1998, plaintiff applied for promotion to the rank of associate professor. At that time, the P&B Committee for the Department voted not to recommend plaintiff's promotion to associate professor.

On or about May 15, 1998, plaintiff appealed the negative recommendation to the president of Queens College, Allen Sessoms (Sessoms). Sessoms denied the appeal.

### 6. Plaintiff's Spring 1999 Teaching Load

Full-time faculty at all of the senior colleges within the CUNY system are required to teach the equivalent of twenty-one "contact" class hours each academic year. Since the faculty in the Sociology Department at Queens College are annually given three hours credit for committee work and individual scholarship, they teach only eighteen contact class hours each academic year, divided into six three-hour sections. Each semester, full-time faculty in the Department

6

teach two sections of a particular course and one section of another, involving two course "preparations," i.e., the work involved in drafting syllabi and preparing lecture notes.

During the Spring 1998 semester, Smith prepared the teaching schedule for the Department faculty for the Fall 1998 semester, in which plaintiff was scheduled to teach two sections of Sociology 211, "Racial and Ethnic Relations," and one section of Sociology 240, "Sociology of Gambling." As a result of a clerical error, one section of Sociology 211 was not listed in the schedule of classes distributed to students for Spring registration and, thus, it had no enrollment. On May 20, 1998, at the end of Spring registration, Smith cancelled one of the Sociology 211 sections for the Fall 1998 semester based on insufficient enrollment.

Following the cancellation of the Sociology 211 section, Smith offered plaintiff three options to meet his teaching obligations for the 1998-1999 academic year: (1) teaching a substitute course during the Fall 1998 semester; (2) receiving credit for mentoring activities; or (3) teaching four sections during the Spring 1999 semester. Plaintiff contends, however, that he was not offered "team-teaching" as an option, which had been offered to a white professor, Paul Blumberg (Blumberg) when his scheduled course was cancelled for insufficient enrollment. CUNY contends that Blumberg was not similarly situated to plaintiff because Blumberg (1) was assigned to teach a course entitled "Political Sociology" jointly with an unpaid volunteer adjunct professor; (2) had agreed to teach four courses in the Spring 1999 semester with three preparations; and (3) had previous experience teaching a variety of different courses within the Department. According to plaintiff, however, Blumberg had never previously taught the "Political Sociology" course.

CUNY further contends that "team-teaching" was not available to plaintiff because he

was the only faculty member who taught "Sociology of Gambling" and "Racial and Ethnic Relations" and, thus, there was no faculty member with whom to pair him to teach those courses. Plaintiff does not dispute that he is the only professor who taught "Sociology of Gambling," but he contends that three other professors, as well as several adjunct professors, also taught "Racial and Ethnic Relations."

CUNY also contends that if plaintiff had been assigned to team-teach other courses, he would have been required to complete three course preparations, a situation which he had expressly rejected. According to plaintiff, he could have been assigned to team-teach "Racial and Ethnic Relations" with Min during the Fall 1998 semester, which would not have required a third course preparation. CUNY contends, however, that Professors Min, Tang, and Habtu, all of whom taught Sociology 211, were unavailable to team-teach with plaintiff because Min and Tang were fully occupied that semester and Habtu had his teaching responsibilities assigned to him by the Director of the SEEK program not the College.

By letter to Smith dated June 29, 1998, plaintiff proposed a fourth alternative – teaching a second section of "Sociology of Gambling" in the Fall 1998 semester. Plaintiff indicated in that letter that if his second section did not attract sufficient enrollment, then he would opt to teach two courses in the Fall 1998 semester and four courses, with two preparations, in the Spring 1999 semester. Plaintiff agreed that as a last resort, he would opt to receive credit for his mentoring activities, as he found any alternative requiring a third preparation, such as the teaching of substitute courses, to be unacceptable. Smith accepted plaintiff's proposal and opened a second "Sociology of Gambling" course for enrollment in the Fall 1998 semester after the pre-registration period. In September 1998, when fewer than eight students enrolled for the course, it

8

was cancelled for insufficient enrollment. According to plaintiff, Smith knew that the course was not likely to fill because the majority of sociology students register for courses during the pre-registration period. Following the cancellation of the second "Sociology of Gambling" course, plaintiff taught only two course in the Fall 1998 semester and four courses, with two preparations, in the Spring 1999 semester.

### 7. Internal Complaint of Discrimination

The President of Queens College annually appoints a group of employees to serve as members of the Affirmative Action Committee (AAC), which is chaired by the Affirmative Action Officer (AAO). The procedures of the AAC are set forth in an annual college publication entitled "Your Right to Know," which is distributed to all members of the Queens College community at the beginning of each school year. According to CUNY, the AAC is only empowered to investigate internal complaints of discrimination and to make recommendations of corrective action to the President; when an employee opts to pursue a complaint of discrimination with an outside agency or a court, the AAC must discontinue its investigation and relinquish jurisdiction to CUNY's Office of General Counsel; and the investigatory procedures of the AAC are separate and apart from the grievance process set forth in the collective bargaining agreement (CBA) between plaintiff's union, Professional Staff Congress (PSC-CUNY) and the College.

On April 19, 1999, plaintiff filed a complaint of discrimination and hostile work environment against the Department, Smith, members of the P&B committee, Savage and Heilman with the Queens College AAC. Plaintiff specifically stated in the complaint that he was

9

"not saying that professor Smith is a racist, he sees himself a [sic] protecting the department and the faculty."

By letter dated April 30, 1999, Valli Cook (Cook), the Director of Community Relations & Affirmative Action and the Queens College AAO at that time, notified plaintiff that a sub-committee of AAC members had been formed to review his complaint and to investigate the allegations contained therein.

### 8. Plaintiff's May 1999 Evaluation

The chairperson of the Sociology Department meets with full-time faculty each May to evaluate their teaching performance, scholarship and service to the college. Pursuant to the CBA, the purpose of annual professional evaluations is "to encourage the improvement of individual professional performance and to provide a basis for decisions on reappointment, tenure and promotions." (CBA, ¶ 18.1). However, according to CUNY, the results of the evaluation are not used by the college to set a faculty member's salary or benefits. (Declaration of Charles Smith [Smith Decl.], ¶ 32).

On May 4, 1999, Smith held an evaluation conference with plaintiff. By letter dated May 3, 1999, which was received by Smith in advance of the conference, plaintiff outlined his professional activities for the academic year. Specifically, plaintiff indicated (1) that he taught six classes during the academic year; (2) that although he continued to serve on "two or three" department committees, he did not serve on the Selection Committee for the Mellon Minority Undergraduate Fellowship Program as he did in the past; (3) that he had no funded research that year, although he continued to do field work on horse racing and public policy; (4) that he did not

10

submit any writing for publication that year; (5) that he had not "engaged much is [sic] professional activities" that year; (6) that although he continued to review articles for the *Journal of Gambling Studies*, he resigned from its editorial board because of "difficulty with e-mail;" (7) that he let his membership in the American Sociological Association lapse; and (8) that he had filed a complaint against the Department with the College's AAC.

The May 1999 Annual Evaluation Form (the evaluation form) indicated that all reports of plaintiff's teaching remained "strong and positive," and that the previous offer for plaintiff to find out what he required to access his e-mail so that such equipment could be provided to him was repeated. In addition, Smith noted the following on the evaluation form:

> "[Plaintiff] filed a formal grievance against the department on May 19th, 1999 [sic]. In this context, [plaintiff] indicated that he felt it difficult to assume greater Departmental and College wide [sic] responsibilities than those reported. While I regret this, I indicated that it was understandable. I did note explicitly, however, that in order for the Department to act positively on any future promotion, it was necessary for [plaintiff] to produce a body of scholarly work that could be reviewed by both the Departmental P&B Committee and external referees."

By letter dated May 4, 1999 to Smith, plaintiff indicated that he refused to sign the evaluation form because of the language in the evaluation form indicating that Smith "repeated an offer made previously" to purchase any necessary computer equipment. According to plaintiff, Smith had never made a previous offer to purchase a modem for his laptop computer and, therefore, he would not sign the form because it was inaccurate.

### 9.    The "Sociology of Gambling" Course

From 1994 until the Fall 2000 semester, plaintiff taught "Sociology of Gambling," an elective course, under the course number "Sociology 240". "Sociology 240" is a course number

11

assigned by the registrar's office to new sociology courses that have not been assigned a permanent course number. According to CUNY, although Sociology 240 courses are not listed in the college catalogue, they are listed in the schedule of classes distributed to students during registration and are treated the same in every other respect as courses with permanent course numbers. According to plaintiff, teaching a course under the "Sociology 240" course number "does not carry the same weight as an approved course in terms of scholarly accomplishment." (Plf. 56.1 Stat., ¶ 34).

In order to get a new course assigned a permanent course number, the faculty member proposing the new course must obtain the approval of his or her departmental curriculum committee (CC), the Queens College Academic Senate Undergraduate Curriculum Committee (ASUCC), the CUNY Board of Trustees and ultimately the New York State Education Department (NYSED).

On May 10, 1999, plaintiff applied to the Sociology Department CC for the assignment of a permanent course number for the "Sociology of Gambling" course. According to defendants, the application was submitted in insufficient time for the CC to complete the approval process by June 7, 1999, the end of the Spring 1999 semester. However, plaintiff contends that it was the Department that requested that he submit the application at that time and that nothing prevented the Department from submitting the application to the ASUCC in time for approval by the Fall 1999 semester.

Plaintiff taught the "Sociology of Gambling" course under course number "Sociology 240" during the Fall 2000 semester. In Spring 2001, "Sociology of Gambling" was assigned the permanent course number "Sociology 277." However, according to plaintiff, the Department

prevented him from teaching the course that semester because he had taught the course more than three times as a Sociology 240 course.

#### 10. AAC Preliminary Conference

On May 26, 1999, the AAC sub-committee held a preliminary conference with plaintiff to discuss his allegations of discrimination and to advise him that the investigation of his complaint would continue into the Fall 1999 semester.

By memorandum dated June 1, 1999, Cook advised Sessoms of the status of the sub-committee's work and that the sub-committee would not convene during the summer break.

#### 11. Plaintiff's Requests for Paid Disability Leave

According to plaintiff, in early August 1999, his pre-existing medical condition of high blood pressure and hypertension got worse. On August 13, 1999, plaintiff submitted to the Queen's College Human Resources Office (HRO) an Application for Temporary Disability Leave of Absence requesting paid absence for the period from September 1, 1999 until August 31, 2000. The medical documentation accompanying plaintiff's application indicated that he was being treated for chronic hypertension and obesity since 1993 and that he required periodic follow-up.

On that same day, plaintiff also submitted an application under the Family and Medical Leave Act (FMLA) requesting paid leave on the basis that his serious health condition was being negatively impacted by a hostile work environment. According to plaintiff, he requested such leave for the full academic year, from September 1, 1999 through August 31, 2000, in accordance

13

with the instructions on the FMLA application. The medical certification accompanying

plaintiff's application indicated that he has chronic hypertension and obesity since 1993 and that

he needed prescription medication and periodic follow-up.

Upon receipt of plaintiff's applications, the HRO inquired of plaintiff's treating

physician, Dr. P. Subramanian, how chronic hypertension since 1993 interfered with plaintiff's

teaching responsibilities, and requested additional information regarding plaintiff's medical

condition and needs. Dr. Subramanian responded that plaintiff indicated that he was

experiencing a lot of job-related stress for approximately two years, which had intensified, and

that such job-related stress "may affect a person's hypertension and weight gain significantly."

On August 23, 1999, the HRO granted plaintiff unpaid leave under FMLA for the period

from September 1, 1999 to November 24, 1999, and paid temporary disability leave for the

period from November 29, 1999 to January 31, 2000[3]. The letter notifying plaintiff that his

applications had been approved expressly indicated that he must submit a new application for an

extension of disability leave, with proper medical documentation, and that he may be required to

be examined by a physician of the College's choice.

### 12. First EEOC Complaint

On August 23, 1999, plaintiff filed a complaint of discrimination based on race and

national origin and retaliation against Queens College, the Sociology Department, Smith,

---

[3] On October 4, 1999, the HRO issued an amended letter to plaintiff correcting the end
date of plaintiff's approved leave to January 28, 2000, to conform to the start of the Spring 2000
semester on January 29, 2000.

members of the P&B committee, Savage and Heilman with the Equal Employment Opportunity Commission (EEOC). Specifically, plaintiff alleged (1) that the promotion and tenure committee (the committee) failed to recommend him for promotion to associate professor based upon his race; (2) that by failing to recommend him for promotion, Smith and the committee retaliated against him for his filing of complaints against Savage and Heilman; (3) that the Department discriminated against him by failing to offer him the option of "team-teaching" in the Fall 1998 semester; (4) that Smith retaliated against him in performing his role as chair of the Department; (5) that Savage discriminated against him by preventing him from getting a laptop computer for a number of years; and (6) that Smith discriminated against him because he opposed Heilman becoming chair of the Department and because he complained about Savage. In the EEOC complaint, plaintiff again indicated that he was "not saying that professor Smith is a racist, [but] he sees himself as protecting the department and the faculty."

13.     Decision on Plaintiff's Anticipated Request for an Extension of
        Temporary Disability Leave

On October 5, 1999, Smith, Dean Donald Scott (Scott), Denkensohn, and the director of the HRO, Maxine Rothenberg (Rothenberg), met to discuss the College's response should plaintiff apply for an extension of paid disability leave for the Spring 2000 semester. At that meeting, Smith expressed his concerns that plaintiff had been acting erratically and irrationally during the Spring 1999 semester. At that meeting, it was decided that in the event plaintiff applied for an extension of disability leave for the Spring 2000 semester, he would be required to be examined by a psychiatrist or psychologist of the College's choice to ascertain if there was a

15

mental health disability.

14.     CUNY's Notice of the EEOC charge

CUNY contends that it first received notice of the EEOC charge on October 18, 1999.

15.     Cessation of the AAC Investigation

On October 19, 1999, the AAC sub-committee held a second meeting to outline further steps in its investigation. CUNY maintains that upon learning that plaintiff had filed an EEOC complaint of discrimination, the AAC ceased its investigation in accordance with the College's policy of relinquishing all jurisdiction of discrimination complaints in which formal charges are filed to its Office of General Counsel (OGC). However, according to plaintiff, Cook knew as of the second week of September 1999, prior to the second meeting of the sub-committee, that plaintiff had filed an EEOC complaint, yet the AAC continued its investigation at that time. By letter dated November 11, 1999, Cook informed plaintiff that the AAC stopped its investigation upon receiving written notification that plaintiff had filed a complaint with the EEOC.

16.     Denial of Plaintiff's Application for an Extension of Paid Disability Leave

By letter dated November 30, 1999, which was prepared by Denkensohn and signed by Rothenberg, the College requested that plaintiff notify the HRO by December 10, 1999 whether he intended to apply for an extension of disability leave for the Spring 2000 semester. On December 7, 1999, plaintiff orally advised the HRO of his intention to apply for an extension of disability leave. By letter dated December 9, 1999, plaintiff indicated his intention to apply for

16

an extension in writing. On December 17, 1999, following receipt of plaintiff's letter of

intention, Denkensohn arranged to have him examined by a psychiatrist, Dr. Azariah Eshkenazi.

Plaintiff submitted his application for an extension of disability leave on December 28,

1999 (the extension application). The medical documentation accompanying the extension

application indicated that plaintiff was still being treated for chronic hypertension and obesity

and that he also suffered from chronic fatigue.

In his report, dated January 7, 2000, Dr. Eshkenazi indicated that "with a reasonable

degree of medical certainty that from a psychiatric point of view, [plaintiff was] able to resume

his duties" at the College. Plaintiff contends that Dr. Eshkenazi's opinion was in conflict with

Dr. Subramanian's opinion and, thus, the CBA required that the parties seek the opinion of a

third physician acceptable to both plaintiff and the College president, and that the opinion of such

third physician should be accepted as conclusive. (CBA, § 16.3[f]). However, by its terms, that

section of the CBA applies only to employees who were absent for more than thirty (30)

consecutive working days who are seeking to return to work[4].

By letter dated January 28, 1999, Rothenberg advised plaintiff that the College had not

---

[4] Section 16.3(f) of the CBA provides that "[w]hen any absence because of a temporary disability exceeds thirty (30) consecutive working days, the absentee shall present a statement from his or her physician explaining the nature of his or her temporary disability and certifying that he or she is fully capable to return to work. In the case of any such absence because of a temporary disability in excess of thirty (30) consecutive working days, the college may also require an examination by a physician in its employ or appointed by it, who shall certify his or her belief that the absentee is fully capable of returning to work. In cases in which there is a conflict of opinion, a third physician, acceptable to the absentee and to the President of the College, shall be called in and his or her judgment shall be accepted as conclusive. In the event that it is found that the condition of such person is such that he or she is incapable of resuming his or her normal duties, such person shall apply for such additional period of leave of absence as may be necessary. Failure to make such application for an additional period of leave of absence shall be deemed neglect of duty."

17

yet rendered a determination on his extension application. On either January 31, 2000 or February 1, 2000, Denkensohn, Scott, Smith and Rothenberg met to discuss Dr. Eshkenazi's report. The College provided plaintiff with a copy of Dr. Eshkenazi's report on February 7, 2000.

By letter dated February 1, 2000, Rothenberg notified plaintiff that his extension application was denied on the basis that the medical documentation he submitted did not support temporary disability leave and that he should report to duty on February 3, 2000. In addition, plaintiff was advised that if he preferred, the College would arrange for him to teach only two courses that semester, and to make up one course in a subsequent semester. On February 2, 2000, plaintiff appealed the denial of his extension application to Rothenberg. When plaintiff failed to appear for duty on February 3, 2000, the College considered him to be absent without leave and Rosenberg removed him from the College's payroll. Plaintiff was notified that he was removed from the payroll by letter dated February 3, 2000.

By letter dated February 4, 2000, plaintiff provided Rothenberg with a copy of a psychiatric referral from Dr. Subramanian.

On February 23, 2000, Dr. Subramanian submitted a report to Rothernberg containing a more detailed description of plaintiff's medical condition. The report indicated, *inter alia*, that plaintiff was being treated for chronic hypertension, obesity and stress syndrome; that he was referred for psychiatric help; that he was being treated with prescription drugs and psychotherapy; and that his health prevented him from returning to work at that time. On February 29, 2000, plaintiff also provided Rothenberg with a report prepared jointly by Maria del Carmen Perez, a psychiatric social worker, and Dr. Peter Leong, a psychiatrist, dated February

18

25, 2000, which indicated that he was anxious and depressed; that he was prescribed medication; and that he was advised to stay away from his teaching duties until April 10, 2000.

According to plaintiff, notwithstanding the two medical reports that he provided, the College refused to reconsider the denial of his extension application and to reinstate him to the payroll, resulting in a loss of pay for six months. Plaintiff was returned to the College's payroll in August 2000, prior to the start of the Fall 2000 semester.

Plaintiff contends that the denial of his application for an extension of leave was discriminatory because the extension application of a white female professor, Lynn Zimmer (Zimmer) was granted. According to Rothenberg, Zimmer has a well-documented history of multiple sclerosis, which caused her to be absent from the College for several semesters and to, eventually, go out on total disability leave, without pay, effective November 24, 2002, and, thus, she is not similarly situated to plaintiff.

### 17. Grievance

On March 7, 2000, PSC-CUNY, filed a Step I grievance against the College on plaintiff's behalf based upon the failure to grant him disability leave for the Spring 2000 semester. According to plaintiff, before the Step I meeting, Denkensohn made an offer to plaintiff's union lawyer, Nicholas Russo (Russo), and to Professor Charles Molesworth (Molesworth), a union representative, to the effect that if plaintiff dropped his EEOC complaint, the College would grant his extension application, reinstate him on the payroll, and allow plaintiff to return to the Department for the Fall 2000 semester. Plaintiff declined the offer.

According to plaintiff, when no decision was rendered on the Step I grievance by April

19

10, 2000, the union submitted the case to Step II in accordance with the CBA. On June 8, 2000, a Step II grievance meeting was held. On or about August 31, 2000, the Vice Chancellor for Faculty and Staff Relations, as Designee of the Chancellor, denied plaintiff's grievance. Specifically, the Vice Chancellor found, *inter alia*, (1) that the documentation presented by plaintiff failed to establish that he suffered from a physical or mental incapacity entitling him to take disability leave for the Spring 2000 semester; (2) that while the College may have given plaintiff the benefit of the doubt regarding his need for temporary disability leave for the Fall 1999 semester, it was entitled to seek further documentation with respect to extending that leave; (3) that it was clear from the record, including plaintiff's own admission, that plaintiff's alleged inability to work was rooted in his desire to absent himself from the College until Smith's term as the Department chairperson ended in the Fall of 2000; (4) that plaintiff's personality conflict with Smith did not constitute a physical or mental incapacity; (5) that nothing in the CBA required the College to get a third medical opinion and section 16.3(f) applied only to situations where an employee seeks to return to work from leave; (6) that a third medical opinion would not be helpful in any event because plaintiff's evidence did not raise even a colorable claim of a disability requiring another semester's leave; and (7) that the College's refusal to grant plaintiff's extension application was not retaliatory, particularly since the College approved his first requrest for disability leave after plaintiff had filed the AAC complaint.

On October 16, 2000, the union served a demand for binding arbitration. The union discontinued the arbitration case on or about March 1, 2002.

18.     Second Administrative Complaint

On or about July 18, 2000, the EEOC dismissed plaintiff's first EEOC charge and issued plaintiff a right-to-sue letter.

On or about July 24, 2000, plaintiff filed a second charge of discrimination with the EEOC alleging that CUNY retaliated against him by denying his request for an extension of temporary disability leave, by removing him from the payroll, and by stopping the AAC investigation because he filed the prior EEOC charge. The EEOC found that CUNY retaliated against plaintiff by discontinuing the AAC investigation, but that the remaining contentions were without merit.

By decision dated November 15, 2001, the EEOC determined that the College retaliated against plaintiff when it stopped the AAC investigation of plaintiff's internal complaint.

On March 11, 2002, the EEOC issued plaintiff a right-to-sue letter on his second EEOC complaint.

B.    Procedural History

On September 21, 2000, plaintiff commenced this action against Queen's College[5]. On November 5, 2001, plaintiff amended his complaint, *inter alia*, to add CUNY and the individual defendants as party defendants. On or about May 30, 2002, plaintiff filed a second amended complaint against CUNY and the individual defendants, alleging, *inter alia*, claims for violations of 42 U.S.C. § 1981 and Title VII.

In September 2002, CUNY and the individual defendants moved to dismiss the second

---

[5] The claims against Queens College were terminated on May 30, 2002.

21

amended complaint. By order dated July 29, 2003, Judge David G. Trager[6] (1) granted the

branch of the motion which was to dismiss plaintiff's § 1981 claims, and those claims were

dismissed in their entirety; (2) granted the branch of the motion which was to dismiss plaintiff's

Title VII claims against the individual defendants, and those claims were dismissed as against the

individual defendants; (3) granted the branch of the motion which was to dismiss plaintiff's Title

VII disparate treatment claims arising prior to December 11, 1998 as time-barred, and those

disparate treatment claims were dismissed; (4) denied the branch of the motion which was to

dismiss plaintiff's Title VII hostile work environment claims; and (5) denied the branch of the

motion which was to dismiss plaintiff's Title VII retaliation claims. Accordingly, all claims

against the individual defendants were dismissed, and the only claims remaining are the Title VII

hostile work environment, retaliation and disparate treatment claims arising after December 11,

1998 against CUNY.

Defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for

summary judgment dismissing the remaining claims.


II.    ANALYSIS

    A.    Summary Judgment Standard

Summary judgment should not be granted unless "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). A fact is material "if it might affect the outcome of the suit under

---

[6] This action was reassigned from Judge Trager to me on October 15, 2003.

the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). An issue of fact

is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact.

See id. The moving party bears the initial burden of establishing the absence of any genuine

issue of material fact, after which the burden shifts to the nonmoving party to establish the

existence of a factual question that must be resolved at trial. See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986). The trial court is required to

construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable

inferences in its favor. See id. at 252, 106 S.Ct. 2505 ; Cifarelli v. Village of Babylon, 93 F.3d

47, 51 (2d Cir. 1996).


B.     Hostile Work Environment Claim

CUNY contends that the conduct of which plaintiff complains is not sufficiently

pervasive or severe so as to establish a hostile work environment claim.

Plaintiff contends that the evidence establishes that over a fourteen year period, he was

subjected to repeated acts of discrimination and retaliation by the Department under the

leadership of Smith, and that the acts of Savage and Heilman represent the acts of Smith. In

addition, plaintiff contends that the totality of circumstances indicates that the conduct of which

he complains was severe enough as to constitute a hostile work environment.

"A Title VII hostile work environment claim requires a showing that the harassment was

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment." Fairbrother v. Morrison, 412 F.3d 39, 48 (2d Cir. 2005)(internal

quotations and citations omitted). The plaintiff must demonstrate that his or her workplace was

23

"so severely permeated with discriminatory intimidation, ridicule and insult that the terms and conditions of [his or] her employment were thereby altered." Id. "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999); see also Fairbrother, 412 F.3d at 48 (holding that a hostile work environment claim has both objective and subjective elements); Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (accord).

A plaintiff may establish a hostile work environment claim by showing either that "a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his or her] working environment." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000). In considering a motion for summary judgment dismissing a hostile work environment claim, the court must determine "whether a rational fact-finder could conclude, on the basis of the evidence in the record, that the conditions of [plaintiff's] employment were sufficiently 'severe or pervasive' to create an objectively hostile or abusive work environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), abrogated on other grounds by Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In determining whether a plaintiff has established a hostile work environment claim, the court must look to the totality of circumstances. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004). Factors that the court should consider in making its hostile work environment determination include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

24

interferes with an employee's work performance." Harris, 510 U.S. at 23, 114 S.Ct. 367. However, "no single factor is required." Id.

### 1.    Pervasiveness of Conduct

Second Circuit precedent "allows a combination of seemingly minor incidents to form the basis of a [hostile work environment] claim once they reach a critical mass." Deters v. Lafuente, 368 F.3d 185, 189 (2d Cir. 2004)(internal quotations and citation omitted). However, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," Terry, 336 F.3d at 148 (internal quotations and citation omitted), and incidents that are "relatively minor and infrequent" are insufficient to sustain a hostile work environment claim. Deters, 368 F.3d at 189.

The first conduct of which plaintiff complains, the actions of Savage, predate Heilman's comment, which is the next act of which plaintiff complains, by almost six years. In addition, there is almost eight months between the cancellation of plaintiff's second "Sociology of Gambling" course by Smith in the Fall 1998 semester, which resulted in his having to teach a fourth course in the Spring 1999 semester, and the next act of which plaintiff complains, the May 1999 evaluation by Smith. Moreover, there is almost six months between the time the Department failed to assign a permanent course number to plaintiff's "Sociology of Gambling" course in May 1999 and the next allegedly discriminatory act, which was the cessation of the AAC investigation on November 11, 1999. The final act of which plaintiff complains is the denial of his request for an extension of disability leave by, *inter alia*, Smith and Denkensohn on February 1, 2000. Even assuming that these acts were discriminatory, nothing in the record

25

indicates that there was a "pattern of nearly constant harassment," Deters, 368 F.3d at 189

(internal quotations and citations omitted), sufficient to establish the requisite pervasiveness

element of a hostile work environment claim.

Moreover, a plaintiff alleging a hostile work environment claim must also establish that

"the conduct at issue was not merely tinged with offensive connotations, but actually constituted

*discrimination* because of [race or another protected category]." Oncale v. Sundower Offshore

Services, Inc., 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)(emphasis in

original)(internal quotations and citations omitted). Plaintiff does not allege that Smith made any

racially insensitive remarks, or that his conduct was based in any part on racial animus. Indeed,

in both his AAC complaint and EEOC complaint, plaintiff specifically denied that he was

alleging that Smith was a racist and the record is bereft of any evidence from which a rational

fact-finder could reasonably find the conduct at issue to be offensive or discriminatory.

Accordingly, plaintiff has not established that the conduct at issue was so pervasive as to sustain

a hostile work environment claim. See, e.g. Olle v. Columbia University, 332 F.Supp.2d 599,

615 (S.D.N.Y. 2004), aff'd, 136 Fed.Appx. 383 (2d Cir. 2005)(granting defendants' motion for

summary judgment dismissing plaintiff's hostile work environment claims where, *inter alia*,

plaintiff failed to demonstrate that most of the behavior at issue could reasonably be understood

to be offensive or discriminatory).


      2.     Severity of Conduct

Plaintiff may still establish a prima facie hostile work environment claim, however, if he

can establish that the conduct at issue was sufficiently severe so as to alter the working

conditions of his employment. See, Terry, 336 F.3d at 149 (holding that a work environment may be actionable if the conduct at issue is *either* so severe *or* so pervasive as to alter the working conditions of a reasonable employee). In order to sustain a hostile work environment claim, the conduct of which the plaintiff complains must be of "such quality or quantity as to meet the standard of severe or pervasive harassment or abuse." Dawson, 373 F.3d at 273 (internal quotations and citation omitted); see also Whidbee, 223 F.3d at 70 (holding that the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of his or her employment negatively altered).

As a matter of law, none of the conduct of which plaintiff complains is sufficiently severe so as to establish a hostile work environment claim. See, e.g. Ruggieri v. Harrington, 146 F.Supp.2d 202, 217-218 (E.D.N.Y. 2001)(finding that plaintiff's allegations, *inter alia*, that her request for a teaching reduction was denied; that she was denied a department chair position; that her listing in the university directory was incorrect; that two of her summer courses were cancelled; that she was assigned different courses than she thought would be assigned for one semester; that there was no public announcement of her "Dean Emeritus" title; that there was a delay in issuing her a parking permit and access card; and that she was not assigned to teach a particular course she wanted to teach, consisted of nothing more than administrative mixups, minor annoyances, and perceived slights which did not constitute severe or pervasive harassment). Viewed in the light most favorable to plaintiff, the allegations upon which he bases his hostile work environment claim are insufficient to preclude summary judgment dismissing that claim.

C.    Retaliation Claims

Retaliation claims brought pursuant to Title VII, 42 U.S.C. § 2000e-3[7], are analyzed

under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Terry, 336 F.3d at 141; Davis v. State University of

New York, 802 F.2d 638, 642 (2d Cir. 1986). Under the McDonnell Douglas analysis, a plaintiff

must first establish a prima face case of retaliation. 411 U.S. 792, 93 S.Ct. 1817. To establish a

prima facie case of retaliation under Title VII, an employee must show (1) that he or she

participated in a protected activity; (2) that the employer was aware of the activity; (3) that the

employer took  adverse action against the plaintiff; and (4) that a causal connection exists

between the protected activity and the adverse employment action. Terry, 336 F.3d at141;

Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001). "Title VII is violated when a retaliatory

motive plays a part in adverse employment actions toward an employee, whether or not it was the

sole cause." Terry, 336 F.3d at 140-141 (internal quotations and citation omitted). Although, a

retaliatory motive must be "at least a substantial or motivating factor behind the adverse action,"

Raniola, 243 F.3d at 625 (internal quotations and citations omitted), the burden of establishing a

prima face case is minimal. Mandell v. County of Suffolk, 316 F.3d 368, 378 (2d Cir. 2003); de

la Cruz v. New York City Human Resources Admin. Dept. of Social Services, 82 F.3d 16, 20 (2d

Cir. 1996).

Once the plaintiff has established a prima facie case of retaliation, the burden shifts to the

---

[7]  42 U.S.C. § 2000e-3 provides, in pertinent part, that "[i]t shall be an unlawful
employment practice for an employer to discriminate against any of his employees * * *, because
he has opposed any practice made an unlawful employment practice by this subchapter, or
because he has made a charge, testified, assisted, or participated in any manner in an
investigation, proceeding, or hearing under this subchapter."

defendant to offer a legitimate, nondiscriminatory reason for its actions. <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant satisfies its burden, the plaintiff must establish that the defendant's proffered reason was merely a pretext for retaliation. <u>Id.</u> at 804, 93 S.Ct. 1817. In order to defeat summary judgment, the plaintiff must show, by a preponderance of the evidence, circumstances "that it would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on [retaliation]." <u>Terry</u>, 336 F.3d at 138.

CUNY does not dispute that plaintiff's complaints of discrimination and retaliation constitute protected activities under Title VII, but disputes that plaintiff suffered any adverse employment action or that any such adverse employment action was causally related to plaintiff's complaints.

### 1.    Adverse Employment Action

CUNY contends that since a faculty member's displeasure with teaching assignments does not constitute an adverse employment action, plaintiff's retaliation claims involving his Spring 1999 teaching load, the lack of opportunity to team-teach, and the delay in assigning "Sociology of Gambling" a permanent course number must be dismissed. In addition, CUNY contends that absent any loss in salary or benefits, plaintiff's negative evaluation alone is insufficient to sustain a retaliation claim. Moreover, CUNY contends that the decision of the AAC to terminate its investigation "was an appropriate defensive action, consistent with CUNY policy," (CUNY's Memorandum of Law in Support of Summary Judgment [CUNY Mem.], p. 20), and, thus, did not constitute an adverse employment action.

Plaintiff contends that the heavier teaching load assigned to him for the Spring 1999 semester significantly changed his working conditions so as to constitute an adverse employment action. Plaintiff further contends that the failure to timely approve a permanent course number for the "Sociology of Gambling" course diminished his academic achievement. Moreover, plaintiff contends that since annual evaluations provide a basis for promotions under the CBA, the negative evaluation impacted upon his salary and other employment benefits and, thus, constitutes an adverse employment action. In addition, plaintiff contends that the internal AAC investigation, though not a contractual right, was a privilege of employment and, thus, subject to the provisions of Title VII. According to plaintiff, by discontinuing its investigation, the AAC effectively stripped him of a privilege of his employment in retaliation for his filing of a complaint of discrimination.

To establish an adverse employment action, a plaintiff must present evidence of a "materially adverse change in the terms and conditions of employment." Fairbrother, 412 F.3d at 56 (internal quotations and citation omitted). "An 'adverse employment action' is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Terry, 336 F.3d at 138 (citations omitted). The Second Circuit has recognized that examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique [] to a particular situation." Id. (internal quotations and citations omitted).

a.    The May 1999 Evaluation[8]

A negative evaluation alone, absent some accompanying adverse result such as demotion, diminution of wages, or other tangible loss, does not constitute an adverse employment action. See, Chamberlin v. Principi, No. 02 Civ. 8357, 2005 WL 1963942, at * 5 (S.D.N.Y. Aug. 16, 2005); Ash v. New York State Office of Court Admin., No. 00 Civ. 9849, 2005 WL 287416, at * 5 (S.D.N.Y. Feb. 2, 2005), as amended by, 2005 WL 289578; see also Fairbrother, 412 F.3d at 56-57 (holding that plaintiff's "unsatisfactory" evaluation did not constitute an adverse employment action absent some evidence that it negatively altered her compensation, benefits or job title). Even assuming that by containing purportedly inaccurate information, the May 1999 evaluation constitutes a negative evaluation, plaintiff's conclusory assertion that it "impacted upon his salary and other employment benefits," without more, is insufficient to defeat summary judgment. See, e.g. Chamberlin, 2005 WL 1963942, at * 5 (finding that plaintiff's conclusory assertion that the "downgraded" evaluation hurt his professional career and impaired his future promotional opportunities was insufficient to defeat summary judgment); Gurry v. Merck & Co., Inc., No. 01 Civ. 5659, 2003 WL 1878414, at * 5 (S.D.N.Y. Apr. 14, 2003)(finding that the plaintiff's performance evaluation, which contained both positive and negative elements, did not constitute an adverse employment action where plaintiff failed to allege facts from which a jury could conclude that it had material ramifications during her employment or in obtaining future employment); see also Boyd v. Presbyterian Hosp. in City of New York, 160 F.Supp.2d 522, 537 (S.D.N.Y. 2001)(finding that plaintiff's allegation that the defendant wrongfully included

---

[8] As Judge Trager previously found that all conduct occurring prior to December 11, 1998 is time-barred, the first timely act of which plaintiff complains is the May 1999 evaluation.

incidents and errors on her performance evaluation that never took place did not constitute an adverse employment action where plaintiff failed to establish that the inclusion of such purportedly false information led to any change in her employment). Accordingly, plaintiff cannot establish a prima facie case of retaliation based upon the May 1999 evaluation.

b.     The Failure to Assign a Permanent Course Number to Plaintiff's "Sociology of Gambling Course"

The failure to assign a permanent course number for plaintiff's "Sociology of Gambling" course in May 1999 did not negatively impact plaintiff's compensation, benefits, seniority, tenure or promotion opportunities. Rather, the evidence indicates that the College merely failed to meet a subjective desire of plaintiff to have his "Sociology of Gambling" course assigned a permanent course number. "An employer's failure to meet such a subjective desire, alone, does not constitute a materially adverse change in the condition of employment." Blessing v. J.P. Morgan Chase & Co., ___ F.Supp.2d ___, 2005 WL 1844522, at * 6 (S.D.N.Y. Aug. 3, 2005)(internal quotations and citation omitted); see also Gordon v. New York City Bd. of Educ., No. 01 Civ. 9265, 2003 WL 169800, at * 7 (S.D.N.Y. Jan. 23, 2003)(finding that the defendant's failure to provide the plaintiff with a permanent classroom did not constitute an adverse employment action where the plaintiff failed to establish that the lack of a permanent classroom, though a great inconvenience to her, prevented her from doing her job). Plaintiff's bald assertion that the failure to timely approve a permanent course number for the "Sociology of Gambling" course "diminished his academic achievement" is nothing more than unsupported conjecture which is insufficient to defeat summary judgment. See, e.g. Blessing, ___ F.Supp.2d ___, 2005 WL

1844522, at * 6 (finding that the employer's denial of the position plaintiff desired did not constitute an adverse employment action absent evidence indicating that the position he was given was objectively less prestigious or materially less suited to his general career advancement); Ash, 2005 WL 287416, at * 4 (finding that the defendant's failure to transfer the plaintiff did not constitute an adverse employment action where plaintiff presented nothing more than the bald assertion that the position to which he sought to be transferred was more "high-profile" and provided more opportunities for advancement); Ruggieri, 146 F.Supp.2d at 216 (finding that the University's failure to announce that the plaintiff's "Dean Emeritus" title had become effective or to hold a celebratory convocation in her honor did not constitute an adverse employment action, notwithstanding plaintiff's allegation that she lost prestige as a result of such actions, where plaintiff failed to establish a loss of wages, benefits, or other responsibilities). Accordingly, plaintiff cannot establish a prima facie case of retaliation based upon the failure to timely assign a permanent course number to the "Sociology of Gambling" course.

c.    Spring 1999 Teaching Load

The assignment of a heavier teaching load to plaintiff for the Spring 2000 semester does not constitute an adverse employment action. See, e.g. DelaPaz v. New York City Police Dept., No. 01 Civ. 5416, 2003 WL 21878780, at * 4 (S.D.N.Y. Aug. 8, 2003)(finding that the assignment of extra work to plaintiff did not qualify as an adverse employment action); Fridia v. Henderson, No. 99 Civ. 10749, 2000 WL 1772779, at * 7 (S.D.N.Y. Nov. 30, 2000)(finding that the plaintiff's allegations of excessive work did not amount to an adverse employment action).

Moreover, to the extent plaintiff may be alleging that the cancellation of one of his

33

courses in the Fall 1999 semester was retaliatory, such action also does not constitute an adverse

employment action. See, e.g. Ruggieri, 146 F.Supp.2d at 217 (finding that the cancellation of

two of the plaintiff's summer courses did not constitute an adverse employment action where the

plaintiff remained a full, tenured professor with no reduction in salary, benefits or

responsibilities). Accordingly, plaintiff cannot establish a prima facie case of retaliation based

upon the heavier teaching load or the cancellation of one of his course in the previous semester.


d.    Termination of the Internal AAC Investigation

The termination of the internal AAC investigation upon plaintiff's filing of an EEOC

complaint, and the relinquishment of jurisdiction of plaintiff's claims to CUNY's OGC, does not

constitute an adverse employment action. See, e.g. U.S. v. New York City Transit Authority, 97

F.3d 672, 677-678 (2d Cir. 1996)(holding that the defendant's policy of transferring ongoing

internal complaints filed with its Equal Employment Opportunity (EEO) Division to its Law

Department once an administrative charge was filed did not amount to an adverse employment

action) ; see also O'Dell v. Trans World Entertainment Corp., 153 F.Supp.2d 378, 395-396

(S.D.N.Y. 2001), aff'd 40 Fed.Appx. 628 (2d Cir. 2002)(holding that an alleged deficiency in an

employer's internal complaint procedure or internal investigation is not a retaliatory adverse

employment action). In Transit Authority, the Second Circuit held as follows:

> An employer has latitude in deciding how to handle and respond to discrimination
> claims, notwithstanding the fact that different strategies and approaches in
> different cases and classes of cases will result in differences in treatment.
> Reasonable defensive measures do not violate the anti-retaliation provision of
> Title VII, even though such steps are adverse to the charging employee and result
> in differential treatment. The Transit Authority's policy [of transferring internal
> complaints to its Law Department upon the filing of an administrative charge] is

> reasonable because it is a defensive measure otherwise available to the employer; and it is non-discriminatory because the difference in treatment between aggrieved employees who have exercised Title VII rights and those who have not is simply an effect of the employer's choice of defensive measures. [Moreover,] the Transit Authority's defensive measures do not affect the complainant's work, working conditions, or compensation.

97 F.3d at 677. The Second Circuit distinguished other cases holding that the discontinuance of internal investigative procedures could support a claim of retaliation by noting that "the assertion of Title VII rights in those cases cost employees the right, *contractually guaranteed in a collective bargaining agreement*, to proceed against their employers in a binding arbitration that would control the outcome of an ultimate employment decision (firing and denial of tenure)." Id. at 679 (emphasis added).

The issue of whether plaintiff had a contractual right to an internal AAC investigation prevented dismissal of plaintiff's retaliation claim based on the discontinuance of the internal AAC investigation on the prior motion to dismiss decided by Judge Trager. However, it is now clear that, as in Transit Authority, CUNY was not contractually bound to undertake or forgo any internal AAC investigation, as that procedure is not set forth in the CBA, but in the "Your Right to Know" publication. Accordingly, plaintiff cannot establish a prima facie case of retaliation based upon the termination of the internal AAC investigation upon his filing of an EEOC complaint, since such conduct was a reasonable defensive measure which did not affect his work, working conditions, or compensation. See, e.g. Transit Authority, 97 F.3d at 677-678; see also Reilly v. Metro-North Commuter R. Co., No. 93 Civ. 7317, 1996 WL 665620, at * 15 (S.D.N.Y. Nov. 15, 1996)(finding that the defendant's discontinuation of the internal AAO investigation upon commencement of EEOC charges did not constitute an adverse employment action where

35

the plaintiff failed to establish that she had a contractual right or other entitlement to internal claims-handling procedures of a particular kind, or that her work, working conditions, or compensation were affected by the discontinuance of the investigation).

Plaintiff's reliance on the case Hishon v. King & Spalding, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), is misplaced. Unlike Transit Authority, which was decided twelve years after Hishon and which is directly on-point with this case, Hishon did not involve the discontinuance of an internal investigation upon commencement of formal charges. In Hishon, the Supreme Court held that a benefit that is not a contractual right of employment, but that "comprise[s] the incidents of employment * * * or that form[s] an aspect of the relationship between the employer and employees * * * may not be afforded in a manner contrary to Title VII." 467 U.S. at 75-76, 104 S.Ct. 2229. However, for the reasons set forth above, the discontinuance of the AAC internal investigation was not "afforded in a manner contrary to Title VII," and, thus, Hishon is inapposite. Moreover, unlike Hishon, where there was ample evidence that the partnership status at issue was a privilege of employment with the defendant's law firm, this record is devoid of any evidence establishing that the internal AAC investigative procedure was a term, condition, or privilege of a professor's employment at CUNY.

### e. Extension Application

To the extent that plaintiff is alleging that the requirement that he submit additional medical documentation for an extension of disability leave or that he submit to a psychiatric examination to obtain such an extension were retaliatory, such requirements do not constitute adverse employment actions. See, e.g. O'Dell, 153 F.Supp.2d at 396-397 (finding that even if

36

the defendant's requirement that plaintiff obtain additional information regarding her medical leave was retaliatory, requiring such documentation for sick leave is not an adverse employment action). Accordingly, plaintiff cannot establish a prima facie case of retaliation based upon the requirement that he obtain additional medical documentation or submit to a psychiatric evaluation for an extension of disability leave.

### 2. Causal Connection

Although the denial of plaintiff's application for an extension of disability leave may arguably constitute an adverse employment action, CUNY contends that the decision to deny plaintiff's anticipated request for an extension of disability leave was rendered on or about October 5, 1999, prior to receiving notice that plaintiff had filed the first EEOC complaint on October 18, 1999.

Plaintiff contends, *inter alia*, that as of September 1999, Cook was aware that plaintiff had filed an EEOC charge and that Denkensohn "must have been told by" Cook of same. (Plaintiff's Memorandum of Law in Opposition to Summary Judgment [Plf. Mem.], p. 20).

A plaintiff may establish that retaliation was a "substantial or motivating factor" behind an adverse employment action either (1) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." Raniola, 243 F.3d at 624 (internal quotations and citation omitted); see, Ashok v. Barnhart, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003) (internal quotations and citation omitted). "[T]he interval between a protected

37

activity and an adverse action that results in a finding of retaliation is generally no more than several months." <u>Ashok</u>, 289 F.Supp.2d at 314.

Plaintiff has failed to establish a causal connection between the filing of his first EEOC complaint on August 23, 1999 and the denial of his application for an extension of temporary disability leave on February 1, 2000. <u>See</u>, <u>e.g.</u> <u>Hollander v. American Cyanamid Co.</u>, 895 F.2d 80, 85-86 (2d Cir. 1990)(passage of three months is too long); <u>Lambert v. New York State Office of Mental Health</u>, 97-CV-1347, 2000 WL 574193, at * 9-10 (E.D.N.Y. Apr. 24, 2000), <u>aff'd</u>, 22 Fed. Appx. 71 (2d Cir. Nov. 28, 2001)(passage of five months is too long). To the extent that plaintiff is basing his claim on the decision to deny his anticipated request for an extension of leave, that decision was rendered on October 5, 1999, prior to the College's receiving notice of the filing of the EEOC complaint on October 18, 1999. Thus, there is no causal connection between that decision and the filing of the EEOC complaint. Plaintiff's contention that the College "must have been told" of the filing of the EEOC complaint is speculative and insufficient to raise a triable issue of fact. Moreover, the decision to deny plaintiff's anticipated request for an extension of disability leave was rendered almost six months after plaintiff filed the internal AAC complaint and, thus, there is no causal relationship between those activities either. Therefore, plaintiff cannot establish a prima facie claim of retaliation and, thus, summary judgment is warranted[9].

---

[9] In light of this determination, it is unnecessary to address the parties' remaining contentions regarding CUNY's non-retaliatory reasons for its conduct and whether such proffered reasons are pretextual.

D.    Remaining Racial Discrimination Claims

To establish a prima facie claim of employment discrimination based on race or national

origin under Title VII a plaintiff must show (1) that he or she belonged to a protected class; (2)

that he or she was otherwise qualified for the position; (3) that he or she suffered an adverse

employment action; and (4) that "the adverse employment action occurred under circumstances

giving rise to an inference of discriminatory intent." Terry, 336 F.3d at 138.  Summary judgment

dismissing plaintiff's remaining discrimination claims is warranted for the reasons set forth

above regarding his retaliation claims in that he cannot establish that any of the conduct at issue,

with the possible exception of the denial of his extension application, constitutes an adverse

employment action.

With respect to the denial of his extension application, plaintiff has not established that

such conduct "occurred under circumstances giving rise to an inference of discriminatory intent."

Terry, 336 F.3d at 138.  "A showing of disparate treatment[10]–that is, a showing that the employer

treated plaintiff less favorably than a similarly situated employee outside his protected group–is a

recognized method of raising an inference of discrimination for purposes of making out a prima

facie case [of discrimination]." Mandell, 316 F.3d at 379 (internal quotations and citation

omitted).  In order to establish a disparate treatment claim, the plaintiff must show that he or she

was "similarly situated in all material respects to the individuals with whom [he or she] seeks to

compare [himself or herself]." Id. (internal quotations and citation omitted).  Generally, the

question of whether two employees are similarly situated is a triable issue for the fact finder.  Id.;

Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  Nonetheless, a plaintiff must offer

---

[10]  Plaintiff has not raised a disparate impact claim.

sufficient evidence from which a jury could reasonably conclude that there was indeed disparate treatment of similarly situated employees. Khan v. Costco Wholesale, Inc., No. 99 CV 3944, 2001 WL 1602168, at * 7 (E.D.N.Y. Dec. 13, 2001); see also Spiegler v. Israel Discount Bank of New York, No. 01 Civ. 6364, 2003 WL 21983018, at * 2 (S.D.N.Y. Aug. 19, 2003)(holding that a court can properly grant summary judgment where no reasonable jury could find the similarly situated prong met).

The determination of whether a plaintiff is similarly situated to other individuals in "all material respects," varies on a case by case basis, but must be judged based on (1) whether the plaintiff and those individuals whom he or she maintains are similarly situated to him or her were subject to the same workplace standards; and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. Graham, 230 F.3d at 40. The plaintiff's conduct need not be identical to that of the employee with whom he or she seeks to compare himself or herself in order for the two to be considered similarly situated; rather, there need only be an "objectively identifiable basis for comparability," that is "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." Id. The determination of whether two acts are of comparable seriousness requires an examination of the acts themselves, as well as of the context and surrounding circumstances in which those acts are evaluated. Id.

The only employee with whom plaintiff compares himself regarding the denial of his extension application is Zimmer. However, and unlike plaintiff, Zimmer's severe disability was clearly documented. Thus, as a matter of law it cannot be said that Zimmer is similarly situated to plaintiff. Since plaintiff has failed to identify any similarly situated employee treated differently than him with respect to the denial of his extension application, and there are no other

40

circumstances present which give rise to an inference of discrimination, summary judgment

dismissing plaintiff's discrimination claims in their entirety is appropriate.


III.    CONCLUSION

CUNY's motion for summary judgment is granted and the complaint is dismissed in its

entirety.


SO ORDERED.

SANDRA J. FEUERSTEIN
United States District Judge

Dated: November 15, 2005
        Central Islip, New York

Copies to:

MADUEGBUNA COOPER LLP
67 Wall Street, 22nd Floor
New York, New York 10005

ELIOT SPITZER
Attorney General of the State of New York
120 Broadway, 24th Floor
New York, New York 10271
Attn:   Steven L. Banks, AAG